J-S05017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH TANCRAITOR | : | |
| | : | |
| Appellant | : | No. 796 WDA 2017 |

Appeal from the Judgment of Sentence May 3, 2017
In the Court of Common Pleas of Forest County
Criminal Division at No(s): CP-27-CR-0000054-2016

BEFORE: OLSON, J., OTT, J., and STRASSBURGER[*], J.

MEMORANDUM BY OTT, J.:                       **FILED JUNE 12, 2018**

Joseph Tancraitor appeals from the judgment of sentence imposed on May 3, 2017, in the Court of Common Pleas of Forest County following his conviction by jury of reckless endangerment, obstructing highways, disorderly conduct, and harassment.[1] Tancraitor received an aggregate sentence of 30 days to two years less one day of house arrest with electronic monitoring, to be followed by two years of probation. In this timely appeal, Tancraitor challenges the weight and sufficiency of the evidence. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The trial court summarized the material facts of this matter as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2705, 5503(a)(4), 2709(a)(3), and 5507(a), respectively.

[Tancraitor] owns a camp on a private road called Second Avenue. There are six other camps and one permanent residence along Second Avenue. The residence is occupied by Debra Hinderliter and her family. [Tancraitor's] camp is furthest from Little Hickory Road, then the Hinderliter residence, and then the other camps.

Before the events that gave rise to this matter, [Tancraitor] and Ms. Hinderliter were friends. Both of them have had health problems and they used to check on each other. Divisions arose between [Tancraitor] and the other property owners on Second Avenue concerning maintenance of the road. Just before Second Avenue intersects with Little Hickory Road, Second Avenue passes over a culvert pipe through which a small unnamed tributary runs. This section of road could be described as an earthen bridge.

Everyone agreed that the metal culvert pipe had become dangerously corroded but [Tancraitor] wanted to replace it in a way that was more elaborate and expensive than what the other property owners had in mind. In October of 2015, all of the property owners except [Tancraitor] cooperated to replace the metal pipe with a plastic pipe and backfill over it.

On November 20, 2015, [Tancraitor] began pushing a large rock described as a boulder down Second Avenue toward the bridge using his Bobcat. One of the camp owners, Mr. Dan Unrath, parked his truck in front of the Bobcat up the road from the bridge. The police were called and came to the scene. After speaking with a trooper, [Tancraitor] pushed the boulder off the side of the road. No charges were brought against [Tancraitor] as a result of this incident.

However, on December 17, 2015, [Tancraitor] placed the same boulder on or at the bridge. The bridge was rendered impassible for vehicles for four consecutive days. Charges were brought against [Tancraitor] as a result of this incident. On the day following the removal of the boulder, [Tancraitor] briefly blocked the bridge again by parking his Bobcat on it. [Tancraitor] moved his Bobcat after police intervened.

A short time later, Ms. Hinderliter expressly told [Tancraitor] that she was worried about an emergency vehicle not being able to reach her if [Tancraitor] were to block the bridge again. Nevertheless, on April 18, 2016, [Tancraitor] once again blocked the bridge in a way that included the use of his Bobcat to pile up

dirt or gravel on or at the bridge. A second set of charges were [sic] brought against [Tancraitor] for this incident.

Before the December 17, 2015 incident, Ms. Hinderliter had suffered multiple heart attacks. She had a stent implanted but it collapsed and had to be replaced three times. An ambulance came to Ms. Hinderliter's home when these emergencies occurred. Also, three of Ms. Hinderliter's five children have special needs and Ms. Hinderliter was concerned that the school bus which had transported here [sic] children was not able to cross the bridge.

[Tancraitor's] primary argument in his defense was that the repairs to the bridge by the other property owners left the bridge unsafe. However, the bridge was used regularly after the repairs without incident. For example, delivery trucks brought heating oil and packages across.

Trial Court Opinion, 8/18/2017, at 4-5.

In addition to the facts recited by the trial court, we also note that Second Avenue was owned by Tancraitor, although the other property owners were provided right of way on that road by deed. *See* Commonwealth Exhibits 1, 8, and 20 (Property Deeds). Tancraitor had a private method of ingress and egress, separate from Second Avenue, to his property. N.T. Trial, 3/29/2017, at 63. Tancraitor told the other owners to fix the bridge, but despite owning it, refused to pay any portion of the repair costs. *Id.* at 66-67. At trial, Tancraitor claimed none of the other owners had a right of way. *See id.* (Tancraitor's testimony generally).

Tancraitor now challenges both the weight and sufficiency of the evidence supporting his conviction. A challenge to the weight of the evidence must initially be raised before the trial court either by oral motion on the record or written motion prior to sentencing, or by post-sentence motion.

Failure to raise the claim before the trial court results in waiver of the claim. *See* Pa.R.Crim.P. 607; *Commonwealth v. Bryant*, 57 A.3d 191, 197 (Pa. Super. 2012) (Failure to challenge the weight of the evidence presented at trial in an oral or written motion prior to sentencing or in a post-sentence motion will result in waiver of the claim.). Here, the trial court noted Tancraitor did not preserve his claim by any of the required methods. Our review of the certified record confirms the trial court's finding. Accordingly, his weight of the evidence claim has been waived.

We now examine Tancraitor's claim of insufficient evidence.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993). Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. *Commonwealth v. Santana*, 460 Pa. 482, 333 A.2d 876 (1975). When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991).

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

Tancraitor was convicted of two counts of recklessly endangering another person (REAP). This was based on his conduct of blocking the bridge with the boulder and then digging the fill from the bridge rendering it impassible. REAP is defined as follows:

> A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S. § 2705.

"Recklessly," as applied to REAP, has been defined in case law as, "a conscious disregard of a known risk of death or great bodily harm to another person." ***Commonwealth v. Cottam***, 616 A.2d 988, 1004 (Pa. Super. 1992) (citation omitted).

Here, the Commonwealth produced evidence that full-time resident Deb Hinderliter suffered from a heart condition that had already produced multiple heart attacks and had required surgery. Ms. Hinderliter had been required to be transported to the hospital *via* ambulance on multiple occasions due to this condition. Further, there was evidence that Tancraitor knew of this condition and the serious implications of it. Before the personal relationship between the two soured, Tancraitor would check up on Hinderliter to make sure she was okay. By blocking the bridge on two occasions, both of which necessitated police intervention and required the township to hire an independent contractor to repair, Tancraitor made it impossible for any emergency vehicle to approach Ms. Hinderliter or attend to her. Given the on-going nature of her medical condition, and the possibility of serious harm occurring by making it impossible for an ambulance to approach, the jury determined Tancraitor recklessly placed Ms. Hinderliter at risk for serious bodily injury or death. The

trial court found this to be sufficient evidence to support conviction of REAP, and our review of the certified record confirms that conclusion.[2]

Next, Tancraitor was convicted on two counts of obstructing highways and other public passages. The relevant statutory definition of this crime is found at 18 Pa.C.S. § 5507(a) and (c):

> (a) Obstructing.--A person, who, having no legal privilege to do so, intentionally or recklessly obstructs any highway, railroad track or public utility right-of-way, sidewalk, navigable waters, other public passage, whether alone or with others, commits a summary offense, or, in case he persists after warning by a law officer, a misdemeanor of the third degree. No person shall be deemed guilty of an offense under this subsection solely because of a gathering of persons to hear him speak or otherwise communicate, or solely because of being a member of such a gathering.
>
> ...
>
> (c) Definition.--As used in this section the word "obstructs" means renders impassable without unreasonable inconvenience or hazard.

18 Pa.C.S. § 5507(a), (c).

Essentially, Tancraitor claims he is the owner of Second Avenue, it is a private road, and he can do with it what he will, including blocking it or removing it completely. Tancraitor cites no statute or case law to support this

---

[2] Tancraitor claims he left his private gate open for use by Ms. Hinderliter, but she refused the offer. Our review of the certified record leads us to conclude this is a misstatement of the evidence. Tancraitor sent Ms. Hinderliter a text message that stated: "Deb road closed I left my gate open so u can get out. It will be locked at 8 p.m. no more use if u smart get car to drive up and down bridge." N.T. Trial, 3/29/2017, at 88-89, Commonwealth Exhibit 4. Subsequent text messages indicated Tancraitor would lock the gate at 5:00 p.m. *Id.* at 89-90.

claim, particularly, where other landowners use the road as their only method of ingress and egress from their properties, and where the deeds of the properties include a specific grant of right of way.[3]  Accordingly, we dismiss this argument as undeveloped.

Even if we were to consider this claim as a developed argument, it does nothing to address the trial court's findings or to dissuade us from affirming the conviction.  We note that the statute does not define "public passage." Nonetheless, the trial court found, and we agree, that the evidence presented at trial supports a determination that the road was open to the public.  Several witnesses testified regarding a variety of members of the public who used the road without any claim of trespass from Tancraitor.

Further, the trial court examined the definition of "public" as found in the crime of disorderly conduct, 18 Pa.C.S. § 5503.[4]  Section 5503 states, in relevant part:

> As used in this section, the word "public" means affecting or likely to affect persons in a place to which the public or a substantial group has access: among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public.

---

[3] Deeds for several of the properties abutting Second Avenue were entered into evidence.  All contained language granting the deed holder right of passage over the Second Avenue bridge.  *See* Commonwealth Exhibits 1 (Hinderliter deed), 8 (Unrath deed), and 20 (Trypus deed).

[4] Both obstructing a highway and disorderly conduct are found in Chapter 55 of the Crimes Code (Title 18).  The word "public" is also not found in the general definitions of Title 18.  *See* 18 Pa.C.S. § 103.

18 Pa.C.S. § 5503(c). While this definition is not binding upon Section 5507, it is informative and helps to provide a common sense basis for defining "public passage." The trial court stated that public locations, for purposes of disorderly conduct, included "locations which are often privately owned such as apartment houses and places of business or amusement." Trial Court Opinion at 9. Therefore, the fact that Second Avenue is not publically owned and maintained is not dispositive. Rather, one must look to the totality of the circumstances to determine the proper definition. While Tancraitor owned the street, several other persons had free and clear use of the road. There is no evidence of record showing Tancraitor ever attempted or claimed the right to limit the use of Second Avenue to only those people who lived on or owned property accessible from the road. There were no signs posted at the intersection of Second Avenue and Little Hickory Road (the public highway closest to the properties) limiting access to the road.[5] Tancraitor's bald assertions of his right to do anything to the road do not overcome the evidence of record that demonstrates Second Avenue was open to the public and constituted a public passage.

The final two crimes Tancraitor was convicted of are disorderly conduct and harassment. The relevant statutory definitions for those crimes are:

> (a) Offense defined.--A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

---

[5] After the new earthen bridge was installed, Tancraitor did post signs warning people not to cross the bridge, claiming it was unsafe.

> > (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a)(4).

> And,

> > a) Offense defined.--A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

> > > (3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose.

18 Pa.C.S. § 2709(a)(3).

The trial court has ably analyzed Tancraitor's claims regarding the sufficiency of the evidence regarding disorderly conduct and harassment. We rely upon that analysis found at pages 9-10 of the trial court's Pa.R.A.P. 1925(a) Opinion filed on August 18, 2017.

We supplement the trial court's analysis with this brief discussion of "legitimate purpose." An actor may not be convicted of either relevant section of disorderly conduct or harassment if his actions were taken with a legitimate purpose. Tancraitor claims he acted to protect people from the dangers of the newly installed earthen bridge. The jury was free to reject this claim, and they obviously did. We note the record reveals that despite his claims of concern, Tancraitor took no action to ameliorate the danger of the original culvert, which was seriously degraded. Rather, he told the other property owners to fix the bridge, and then complained when they did not fix it in the fashion he preferred. Rather than upgrading the earthen bridge to make it conform to his notion of safety, or to install the type of bridge he envisioned,

both of which would have solved any safety concerns, he merely blocked the bridge multiple times, preventing anyone from using it for any purpose. Accordingly, there was sufficient evidence of record to support the Commonwealth's assertion that Tancraitor acted without a legitimate purpose.

Judgment of sentence affirmed. The parties are directed to attach a copy of the trial court opinion in the event of further proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2018